(No. 13172.—Reversed and remanded.)

M. E. HARRIS *et al.* Plaintiffs in Error, *vs.* DOIT YOUNG *et al.* Defendants in Error.

*Opinion filed June 22, 1921.*

1. PARTNERSHIPS—*partnership exists among owners of oil or mineral leaseholds without express agreement.* A partnership exists where the owners of oil or mineral leaseholds share the profits and expenses of development and the production and sale of the oil according to their interests in the property, whether the division of expenses and profits is made with or without formal written or verbal agreement; but the distinctive features of such a partnership may be changed by articles of partnership.

2. SAME—*delectus personæ does not exist in a partnership for production of oil, in absence of agreement.* Where the owners of oil or mineral leasehold interests, without an express agreement, form a partnership in the operation of their business there is no *delectus personæ* such as exists in ordinary commercial partnerships, but each co-partner has the right to sell his interest in the firm property whenever and to whomever he may choose.

3. SAME—*effect of death of one partner or sale of his. interest where there is no delectus personæ.* Where one member of a partnership for the production of oil or minerals, formed without express agreement by owners of leasehold interests, sells his interest, the incoming partner is not liable for the antecedent debts of the firm as between the partners but takes his interest subject to the payment of antecedent partnership debts; and the death of one partner does not dissolve the firm, but the remaining partners have a lien on the deceased partner's interest for any part of the expenses of the firm which was due from the deceased and which remains unpaid.

4. SAME—*rule as to partnership liens in the oil-producing business.* Where owners of oil leaseholds, without express agreement, have formed a partnership for the production of oil each partner has a lien upon the partnership property for the partnership debts, which lien he may enforce in equity while the property is distinctly partnership property; but such lien is extinguished after a division of either the oil or the proceeds of its sale without any demand for the enforcement of the lien against a particular partner's share.

5. SAME—*effect where one partner's interest in oil leasehold is held in trust to secure indebtedness to bank—liens.* Where one partner in an association of the owners of oil and mineral leaseholds has purchased his interest in the leaseholds through a bank

cashier, who executes a declaration of trust reciting that such interest is held as security for the purchaser's existing indebtedness to the bank, the trustee has a first lien on such interest to the full amount of the purchase money advanced by the bank whether or not the trustee knew of the existence of the partnership, but as to any other indebtedness due the bank the liens of the other partners for such partner's share of the operating expenses are superior, provided the trustee knew of the partnership and took his lien without the knowledge of the other partners.

6. EVIDENCE—*bank book cannot be admitted to prove account in absence of evidence that it is a book of original entries.* A bank book cannot be admitted in evidence to show an account in certain transactions where no proof is offered to show that the book is a book of original entries or that the entries were true and correct or contemporaneous with the transactions.

7. SAME—*complainants in action of account against widow and minor heir of.deceased partner are not competent witnesses—stipulation.* In an action by members of a partnership for an accounting and to establish a lien on the interest of a deceased partner the complainants are not competent witnesses against the widow and minor heir of the deceased partner, who are defendants to the bill, and a stipulation entered into between the complainants and the guardian *ad litem* of the minor cannot be admitted against her.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Clark county; the Hon. WALTER BREWER, Judge, presiding.

EVERETT CONNELLY, for plaintiffs in error.

SAMUEL M. SCHOLFIELD, for defendants in error.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

An order of the United States district court for the eastern district of Illinois was entered October 27, 1909, for the sale of oil and gas leasehold estates held and owned by the J. B. Nay Oil and Gas Company, bankrupt. The leaseholds so sold are known and described in this record as the Payne leases, one being a 24-acre tract and the

other a 40-acre tract situated in Licking township, Crawford county, Illinois. W. W. Shuler became purchaser at said sale for the sum of $5500. The report of the sale was confirmed by the court on December 23, 1909, and a deed was executed to Shuler on December 27, 1909. Shuler made the purchase by virtue of an agreement between himself, M. E. Harris, Charley Johnson and Kore Queen, by which Harris was to have a one-eighth interest therein, Shuler three-eighths, Johnson two-eighths and Queen two-eighths. Shuler on December 31, 1909, deeded to Doit Young, or assigned to him, an undivided one-half interest in the leaseholds, this undivided one-half representing the shares that were to be deeded to Johnson and Queen, the deed of assignment being recorded on January 11, 1916. Young was cashier of the Casey National Bank of Casey, Illinois, and had agreed with Queen that the bank would furnish the money with which to purchase his interest and was to hold Queen's interest in said leaseholds as security for the purchase money and for other money owed the bank and previously borrowed by Queen, in accordance with a certain declaration of trust executed by Young on December 31, 1909, and recorded January 18, 1913. This declaration of trust recites that Young received from Shuler the assignment of an undivided one-fourth working interest in the oil and gas leaseholds, which assignment includes all wells, tankage machinery and appurtenances on and belonging to the 24-acre lease and all other assets due the property. He then certifies that he holds the same in trust for the benefit of Queen, as security for the payment of any and all notes given by Queen to the Casey National Bank or any overdraft or account of Queen in said bank, and upon payment of "any and all such notes or overdrafts at any time, then I, Doit Young, agree to and do assign and set over to Kore Queen, his heirs or assigns, all of the above one-quarter interest in the lease, wells, appurtenances, as above described." Just after executing this declaration

of trust Queen and the bank had a settlement, in which it was found that Queen owed the bank $2755.30, including a $1755.30 note dated January 7, 1909, which the bank continued to hold, and $1000, the remaining balance due on settlement, for which Queen gave his note dated January 4, 1910. The bank also held a note of Queen for $1660 payable to the First National Bank of Shelburn, Indiana, which the Casey National Bank was holding for collection. Johnson failed to take his one-fourth interest in the gas and leasehold interests and Young conveyed or assigned said one-fourth interest to J. G. and C. S. Ewing on March 16, 1910. Shuler did not retain his three-eighths interest in the Payne leaseholds but conveyed the same to the Ewings on April 11, 1910. Shuler also conveyed the remaining one-eighth interest to Harris on March 11, 1910, in accordance with the original agreement between himself, Harris, Johnson and Queen.

Harris, Queen and the two Ewings operated the oil wells on the 24-acre leasehold, and it is claimed in this suit by Harris and the Ewings that they operated the oil wells as partners, under the firm name of Monarch Oil Company, each partner to pay the expenses of operation and to have the proceeds of the wells in accordance with the interest deeded or assigned to them in the Payne leaseholds. The 40-acre Payne leasehold was an undeveloped tract, on which during their alleged partnership they did some boring for oil but sold it to A. M. Myers for about $400. Harris and the Ewings claim that while they and Queen were operating the oil wells on the 24-acre leasehold as partners they paid out $6041.21 for operating those wells and prospecting on the two leaseholds for oil by boring wells, etc., no portion of which was contributed by Queen, and that of the sum expended Harris paid $1666.50, which was $911.35 more than his share of the expenses; C. S. Ewing paid of said expenses $2966.02, or $1078.14 more than his share; and J. G. Ewing paid $1408.69 of said expenses, or $479.19

less than his share; and that Queen's unpaid share of said expenses was $1510.30. Harris sold and transferred his one-eighth interest to B. F. Miller on November 10, 1910, and the Ewings sold and transferred to C. L. Palmer on January 18, 1912, all their right, title and interest in said lease, being an undivided five-eighths. Young retained the undivided one-fourth interest in the 24-acre lease in trust for Queen up to the death of the latter, in July, 1913, and thereafter retained, and still retains, said interest in trust for A. B. Queen, the widow, and Margaret Queen and Edith Thompson, daughters and only heirs of the deceased. It also appears that Young holds what is known as the Randolph leasehold in the same capacity and for a similar use, in which latter leasehold Harris had no interest, and so far as the record shows neither of the Ewings had any interest therein. Queen died intestate in Indiana, of which State he was a resident, and his widow and heirs have continued to live in Indiana since his death, Margaret Queen being a minor. Queen was at all times above mentioned insolvent.

In October, 1916, Harris and the Ewings filed a bill in the circuit court of Clark county, and later an amended bill, for an accounting and to establish a lien on the 24-acre leasehold held by Young in trust for Queen for alleged expenditures by them and for other matters growing out of their partnership with Queen, and in which they alleged there were large sums due them as partners by Queen on a proper accounting, and that their rights as against Young and the banks, as against each other, may be ascertained and decreed. To the amended bill Young, the two banks, the widow and the two children and heirs of Queen were made parties defendant. The two banks answered the bill, denying that there was no declaration of trust in writing by Young as to the indebtedness of Queen to the First National Bank of Shelburn. They averred that Young was holding the 24-acre leasehold in trust for the indebtedness

due the two banks from Queen; that Queen was indebted to the Casey National Bank in the sum of $2500 and to the First National Bank of Shelburn in the sum of $1200 and interest, and that said indebtedness was evidenced by promissory notes secured by the leasehold, and that the indebtedness to the banks had not been paid and that they have a valid lien on the leasehold for the same. The other allegations in the bill they neither admitted nor denied but called for strict proof of the same, and denied that complainants were entitled to any relief whatever. Young made a separate answer to the bill, in which he averred that the Monarch Oil Company was a co-partnership, consisting of the complainants, Harris, the Ewings and Queen, and was operating for oil and gas on the premises aforesaid. He also made the same averments as the two banks in their answers with reference to the indebtedness due them and as to the liens held by them for the same under his declaration of trust, and that complainants had knowledge of said indebtedness and trust, and denied practically all other allegations of the bill and that the complainants were entitled to any relief. The widow and two children of Queen were served by publication as non-residents. The adult daughter and the widow made default. H. M. Janney was appointed guardian *ad litem* for the minor daughter and answered the bill, admitting that she is the daughter of Queen and a resident of Indiana, and that her father died intestate, leaving A. B. Queen his widow and Edith Thompson and Margaret Queen as his only heirs-at-law. He admits that Young holds a one-fourth interest in the leasehold estate as trustee for Margaret's father, and that there was no declaration in writing by the trustee that he holds the lease in trust or as security in any manner for the Shelburn National Bank, but admits that he made the declaration of trust as to the Casey National Bank aforesaid. He asks that Young, Harris and the Ewings be required to make full answer as to all matters charged by them, and that his answer should

be treated as a cross-bill to that end, and said parties he makes defendants thereto, waiving the answer under oath, and asks for full relief as equity may require.

The cause was referred to the master in chancery to take and report the evidence with his conclusions, which he did. Objections were made to the master's findings and conclusions and exceptions were preserved, and on a final hearing the court found and decreed that complainants and Kore Queen were partners, as aforesaid, and operated the oil wells on the 24-acre lease, and that complainants expended the sum of $6041.21 for machinery and for other outlays upon the premises for the firm or co-partnership and that Queen never paid any part of his share thereof, $1510.30, and that he was indebted to them in said sum on accounting. It further found and decreed that Queen was indebted to the Casey National Bank for money loaned him and still owes the sum of $3833.08, and that the complainants and said bank are entitled to liens on the leasehold for said sums; that the bank's lien is prior to complainants' lien and shall draw interest at five per cent from February 5, 1918; that the First National Bank of Shelburn has no lien or interest in the 24-acre lease. Costs were adjudged against the latter bank, A. B. Queen, Edith Thompson and Margaret Queen. The master in chancery is ordered to sell the premises and to pay the costs of suit out of the proceeds of the sale, all exceptions of complainants to the master's rulings being overruled so far as inconsistent with the decree. On appeal to the Appellate Court for the Third District by complainants the decree of the circuit court was affirmed. Complainants' petition for *certiorari* was allowed by this court, and the record is before this court on errors assigned thereon.

Where there is an association of individuals for producing oil or minerals from leasehold properties and the expenses of development and production and sale of the oil are divided or shared according to the holdings of the mem-

'bers of the association in the leasehold property, whether such division of expenses and profits is made with or without formal written or verbal agreement, a partnership exists. In the alleged partnership in question there seems to have been no agreement, either oral or written, with reference to a partnership. The evidence of a partnership in this case is confined to stipulations in the record which will be later considered. In such a partnership, in the absence of a specific agreement, there is no *delectus personæ* as exists in ordinary commercial partnerships. In a partnership each co-partner has the right to sell his interest in the firm property whenever and to whomever he may choose. By such a sale he ceases to be a partner, and at the same time that he ceases to be such a partner his vendee or assignee becomes a partner in his stead with the remaining members of the firm. Such a sale does not dissolve the partnership, and death of a member does not dissolve it. The incoming partner will not be liable for the antecedent debts of the firm as between the partners, but he takes his interest subject to the payment of antecedent partnership debts. Each member has a lien upon the partnership property for the debts due to the creditors of the partnership, which lien he may enforce in equity. These liens exist only against the partnership property while it is distinctly such partnership property. Such liens on the oil itself in favor of the members only exist while it is the property of the firm. When it is separated or divided by division or sale and any part of the oil is set apart to the individual members of the firm as their distinct part or share, or such oil is sold and the proceeds divided among the individual members of the firm, no lien further exists either on the oil thus separated and divided or on the proceeds of that so sold and divided. (*Greenlee* v. *Steelsmith*, 64 W. Va. 353; *Childers* v. *Neeley*, 49 L. R. A. 468; 27 Cyc. 755-763.) So far as the questions now before us appear in this record, we have stated substantially the only difference be-

tween the character of the partnership in question and the ordinary commercial co-partnership, and we further state that any and all of the foregoing distinctions may be obliterated as to mining and oil co-partnerships and ordinary commercial co-partnerships where there is an express contract or articles of partnership drawn up between the owners of the leasehold interest for the formation of the partnership.

In this case there was no dissolution of the partnership by the sale of the interests of Harris and the Ewings or by the death of Queen, and there was no occasion for the declaring of a dissolution of the partnership by the court. If the partnership existed and if Queen failed to contribute to Harris and the Ewings, his partners, for the expenses of operating the leasehold in question for oil, the co-partners had, and still have, a lien on his one-fourth interest for his just portion of such expenses due to them. Young, the trustee, and his bank, from the evidence and from the admissions in the record, at most were only entitled to hold such interest of Queen in the leasehold as security for the debts due and owing to the bank on the settlement between Young and the bank and Queen just after the making of the declaration of trust as to such interest. The declaration of trust does not purport by its language to hold such share as security for any note, overdraft or other indebtedness, except indebtedness existing at the time such declaration of trust was made. He had a superior lien for $1375 of his bank debt, as that amount was the purchase money for Queen's interest, to secure which he held the legal title to the leasehold. That is true whether he had or had not, at the time he took the legal title, knowledge of the then existence of such partnership. (*Reeves, Stevens & Co.* v. *Ayers,* 38 Ill. 418.) As to the remaining amount owed the bank prior to the declaration of trust, the law is that if the partnership existed at that time to his knowledge and when he took the legal title to Queen's interest, the lien of

the partners was superior to his, as he took his lien without the consent of such partners. *Rainey* v. *Nance,* 54 Ill. 29.

Whether or not Young and his bank had a superior lien for more than the purchase money of $1375 aforesaid, depends solely on the question whether or not he or his bank knew of the existence of the co-partnership, the Monarch Oil Company, at the time Young took title to Queen's interest as security and made the declaration of trust, and also upon the further fact whether or not the members of the co-partnership had knowledge of the bank's lien when they formed the partnership, if it was formed after the declaration of trust, as Young's title and declaration of trust were recorded after Queen's death. Upon these questions the record seems to show clearly that the co-partnership was formed by Harris, Queen and the Ewings after the Ewings bought their interests, in March and April, 1910, and that Harris had knowledge that Young was holding Queen's share as security, although he did not know the terms on which he held it. Harris' knowledge or notice was also notice to the Ewings, as partners. Young's admission in the record that Harris, the Ewings and Queen were partners fixes no date when such partnership existed, and hence cannot be taken as an admission that it existed at the date of the declaration of trust in face of the positive proof that it was never formed until later. So, as the record stands, the court is sustained in its finding that the whole of the bank's debt unpaid and secured by the trust agreement was a prior lien, but as the decree will have to be reversed for other reasons and no final judgment or decree can be entered by this court, we make no specific findings which are to be taken as binding on another hearing.

The amount of Young's and the bank's lien found by the court is clearly in excess of what it ought to be, and the evidence in this record does not definitely disclose the correct amount due and actually secured by the declaration of trust, as already indicated. The bank and Young were

allowed to prove as part of this lien subsequent notes and an overdraft due to the bank by Queen and not secured by the declaration of trust. As part of the proof the court allowed them to introduce in evidence a copy of the bank account of Young as trustee for Queen, which showed receipts as such trustee for more than $16,000, apparently composed of receipts of money from the proceeds of the oil sold and taken from the lease in question and from other leaseholds held by Queen, such receipts beginning with February 3, 1909, and continuing up to the death of Queen, and from the death of Queen to January 4, 1918. The other side of the account appears to be checks drawn against this account by Young and Queen for expenses of operation and for family expenses for Queen, and for expenses of operation and for his family's expenses after his death, and for checks drawn in both periods to apply on Queen's debts made before and after the declaration of trust. This copy of the account is known as exhibit "K" in the record, and upon objections being made to it as secondary or not the best evidence, the bank book from which it was taken was put in evidence over plaintiffs in error's objection that the proper proof was not made to admit the bank book and the account contained therein. No proof was offered showing that this book was a book of original entries or that the entries were true and correct or contemporaneous with the transactions. The admission of the book account was clearly erroneous for want of the proper evidence to render it competent for any purpose. (*House* v. *Beak,* 141 Ill. 290.) The evidence tended to show that the two notes of Queen to Young's bank secured by the declaration of trust were renewed by Queen by giving two other notes on February 28, 1912, for $2305 and $239.86, and that subsequent payments had been made on one or both of them. The evidence should have been confined solely to establishing the amount of Queen's indebtedness to the bank secured by the declaration of trust and the amount thereof

due and unpaid, for the lien could not exceed such amount due as against plaintiffs in error.

With reference to plaintiffs in error's claim that Young and his bank should be charged up, as against their lien, with the proceeds of all the oil sold for Queen and received by Young, we do not agree with them. Plaintiffs in error had no lien on such oil after its separation or division and none on the proceeds thereof. It was Young's and the bank's privilege to direct the application of such moneys, and they had the right to allow Queen to use it as he saw fit, either for his own private use or to apply it on his debt, and plaintiffs in error have no legal right to object to such action or to now have such moneys applied to the extinguishing of the bank's debt or lien in any part, as they made no such claim or demand when the moneys were checked and applied and used by Queen.

A stipulation was signed by the solicitor for the plaintiffs in error, the solicitor for the banks and Young, defendants in error, and by the guardian *ad litem* for the minor, Margaret Queen. The stipulation, among other things, in substance admitted that a certain stipulation referred to as exhibit "F" is a statement showing the state of the accounts of the partners of the Monarch Oil Company on June 6, 1911. This statement showed the payment of the sum of $6041.21 by Harris and the Ewings for expenses in operating and prospecting the Payne leases aforesaid and that Queen had paid no part thereof, as already set forth in our statement of facts. This is the only competent evidence in the record that Queen owed plaintiffs in error the sum of $1510.30 on accounting, or any other sum. The stipulation recites that the balance due complainants had not been paid by Young, Queen or his widow and heirs, "so far as the parties hereto know, nor did Kore Queen or Young expressly promise to pay complainants said balance, and so far as the parties to this suit know, the said balance had never been paid to complainants, same being

for machinery and supplies placed on said leasehold by said complainants and paid for by them." The positive proof in this record given by Young as a witness is to the effect that he wrote the statement referred to as exhibit "F" on June 6, 1911, on verbal information and facts furnished him by C. S. Ewing and Harris, and that J. G. Ewing and Queen were not present when the statement was made. Young clearly shows in his testimony that he knew none of the facts from his own personal knowledge. The plaintiffs in error are incompetent witnesses against the minor defendant and the other heir and the widow of the deceased, and the record discloses clearly that the facts were furnished by two of these parties and out of the presence and without the knowledge of Queen. It is the duty of chancellors, in cases of this character, to specially guard the interests of minors and widows. Our statute on evidence protects them, when defending as heirs of a deceased person, against such incompetent testimony, when properly invoked. We hold this stipulation is incompetent against the minor and that it was error to permit it to be admitted against her, although the stipulation was signed by the guardian *ad litem.*

The court in its final decree did not declare what the interest of each plaintiff in error was in the amount of his lien against Queen's leasehold interest. If on another hearing it is found that Queen was indebted to the plaintiffs in error, there should be a finding, also, how much of that amount is due each one of the plaintiffs in error, and also how much, if anything, J. G. Ewing was indebted to such partnership for his failure to pay the full amount of the expenses. Under the proofs in the record it appears that he has not paid his full share of such expenses, and there should be a complete adjustment of all these matters, not only between plaintiffs in error and defendants in error, but also of the rights and interests of the plaintiffs in error among themselves, as they may be shown on another hearing.

There are other errors assigned and discussed in the record, but we do not deem it of sufficient importance to consider them in view of the fact that there must be another hearing.

For the errors aforesaid the judgment of the Appellate Court and the decree of the lower court are reversed and the cause remanded, with directions to set aside the stipulation signed by the solicitors aforesaid as to the guardian *ad litem* and minor defendant and to reconsider the cause on any competent testimony the parties hereto may offer on a further hearing.

*Reversed and remanded, with directions.*