In re ESTATE OF GLEN DALE GRIFFITH, Deceased (Bobbie Calcote, *et al.*, Claimants-Appellants, v. Estate of Glen Dale Griffith, Deceased, Respondent-Appellee).

Fifth District   No. 5—85—0399

Opinion filed December 12, 1986.

Patrick M. Burke, of Brazitis, Burke & Coulson, of Olney, for appellant Bobbie Calcote.

LeFevre, Zeman, Oldfield & Schwarm, Law Group, Ltd., of Vandalia (Larry L. LeFevre, of counsel), for appellee.

JUSTICE JONES delivered the opinion of the court:

The instant appeal arises out of certain estate claims filed by Frank and Bobbie Calcote against the estate of the decedent, Glen Dale Griffith, who, during his lifetime, was a partner with Frank Calcote in a partnership for the production of oil and gas. The trial court, finding that the claims of Bobbie Calcote for moneys advanced to the partnership and for expenses and salary owed by the partnership were not legitimate partnership debts, ruled against Bobbie Calcote as to those claims. On appeal from this judgment denying her claims, Bobbie Calcote contends that the trial court's ruling was against the manifest weight of the evidence where there was no showing that she was either paid back for moneys advanced to the partnership or compensated for services rendered to the partnership. We affirm.

In May or June 1979 the decedent and Frank Calcote, Bobbie Calcote's husband, entered into a partnership named Glenco pursuant to an oral agreement. The purpose of this partnership was to obtain oil and gas leases, secure investors for drilling oil and gas wells on these leases, and drill, complete, and operate such wells for the benefit of the partnership and the investors. The partners agreed to share income and expenses of the partnership on a 50/50 basis.

The partnership began to drill and produce oil wells, drilling approximately 22 wells in the partnership name. The partners subsequently had a "falling out," and on July 3, 1981, the decedent, Glen Dale Griffith, filed a complaint for dissolution of the partnership. The decedent died approximately nine months later on April 2, 1982, while the action for dissolution of the partnership was still pending.

Frank and Bobbie Calcote subsequently filed joint estate claims against the estate of the decedent for moneys allegedly owed to them by the partnership as well as by the decedent. Items one and three of the joint claims related to Bobbie Calcote's claims for "1. Moneys advanced to Glenco Petroleum [sic]" in the amount of $165,167.50 and "3. Expenses and salary due Bobbie Calcote from Glenco Petroleum

[*sic*]" in the amount of $63,937.50. The estate filed a petition to wind up the affairs of Glenco, and trial was had simultaneously on the Calcotes' estate claims and the petition to wind up the affairs of Glenco.

At trial Frank Calcote, the decedent's partner in Glenco, testified that he and the decedent had operated partnership leases together from May or June 1979 until October 1980 when they had had a dispute regarding the partnership. Frank Calcote, who had possession of partnership records, had kept track of operating expenses from the time the first well went on pump on November 4, 1979. He had not billed investors for operating expenses on this or other wells drilled in 1980 until November 19, 1980. Unbilled operating expenses as of the date of the decedent's death on April 2, 1982, totaled $168,629.53, and this amount was uncollected as of the time of trial.

Frank Calcote testified that from the fall of 1981 to the present, he had deposited checks from his wife, Bobbie Calcote, into Glenco's banking account. It was his understanding that Bobbie Calcote would be repaid for these amounts, but no goods or services had been provided to Bobbie Calcote from Glenco during this time.

Frank Calcote testified further that he and his wife had performed secretarial services for Glenco in preparing mailings to potential investors before wells were drilled by the partnership. Approximately 100 mailings, consisting of 50 to 60 pages each, had been made on the shallow wells, and an average of 175 to 200 mailings had been made on the deeper wells. During the year prior to trial, the partnership had been charging investors a management fee of $100 per month and a bookkeeping fee of $75 per month for each producing well, plus $30 to $60 per month in miscellaneous expenses. The partnership had also been charging investors $22 per load to haul salt water away, which amount was paid to Bobbie Calcote, who owned the truck used for this purpose. The billing and collection of operating expenses on partnership wells had been turned over to Oil Producers Association, Inc., which would buy the oil from Glenco's wells and subtract the investors' portion of operating expenses from the oil proceeds.

Bobbie Calcote, Frank Calcote's wife, testified that the amounts collected from Glenco investors by Oil Producers Association, Inc., were paid to Dempsey Management, an oil well management service owned solely by Bobbie Calcote. For its services, Dempsey Management received both the $100 management fee and the $75 bookkeeping fee charged to Glenco investors. Dempsey Management had an oral management agreement with Frank Calcote by which it was re-

sponsible for all operating debts of Glenco.

Bobbie Calcote testified that beginning on December 31, 1981, she had made loans to Glenco out of her personal account. As evidence of these loans, Bobbie Calcote introduced cancelled checks dating from December 31, 1981, to January 7, 1984. Six of the checks were dated prior to the decedent's death on April 2, 1982, while the remaining 31 checks for which she sought reimbursement from the partnership were dated after the decedent's death. The checks were made payable to "Glenco Petroleum" and signed by Bobbie Calcote. In some instances the checks or deposit slips bore notations indicating that they were personal loans or loans to pay bills. Attached to the cancelled checks were deposit slips showing deposits into the Glenco account of the same date. Bobbie Calcote introduced nine other checks written from her personal account to various third parties, which she testified were for the payment of Glenco bills. These checks were dated from December 2, 1982, to May 3, 1984.

Bobbie Calcote additionally introduced 12 demand notes bearing the signature of "Glenco Petroleum, Frank Calcote, and Frank Calcote." These notes were dated from December 31, 1981, to October 25, 1983, and, except for the date of the first note, did not correspond either in date or amount to the checks written by Bobbie Calcote to Glenco as "personal loans." Bobbie Calcote testified that these notes, which were not produced until the time of trial, were from her personal records and that there were no copies of the notes in the records of Glenco. The note of December 31, 1981, included $10,000 that Bobbie Calcote had loaned to "Glenco and Frank Calcote" to buy out an investor's interest. This amount was to have come from each partner's funds individually, and Bobbie Calcote testified that this $10,000 never went through a partnership account.

On cross-examination Bobbie Calcote stated that she had first become aware of the decedent's suit to dissolve the partnership in October 1981 before she had begun making loans to the partnership in December 1981. None of the demand notes from the partnership and Frank Calcote had been signed by the decedent, and she at no time during the decedent's lifetime had received any payment on any of the alleged loans or any of the salary allegedly owed to her by the partnership. Bobbie Calcote had first come into possession of the partnership records in October 1980, and she and her husband had been responsible for keeping the books since that time.

Regarding the notations on the cancelled checks indicating that they were personal loans to the partnership, Bobbie Calcote testified that she "could have added" the notations later when she had gone

through her checks to clarify them for tax purposes. On several of the checks the notation was in blue ink while the check was written out in black ink. Bobbie Calcote had at no time consulted with the administrator of the decedent's estate about the loans made to the partnership.

Bobbie Calcote testified further that the services that she had performed for the partnership included typing, answering the telephone, running copies, and fixing reports to go to the shareholders with regard to drilling and completion. In addition, she had furnished all of the paper for the reports and had provided money for entertaining investors as well as for traveling expenses. She stated that approximately 100 reports and solicitations of 8 to 10 pages each had been mailed out on the wells drilled to depths of 2,700 feet, while approximately 300 mailings of the same length had been made on the wells drilled to depths of 4,200 feet. On one of the wells drilled in 1980, the report sent to investors estimated the cost of "administrative [sic] and office supplies" at $1,500 to $2,500. Bobbie Calcote sought reimbursement for her services in the amount of $2,500 for each of the 19 Glenco wells drilled to depths of 2,700 feet and $3,500 for each of the three wells drilled to depths of 4,200 feet.

At the conclusion of the trial, the trial court entered judgment denying the claims of Bobbie Calcote for moneys allegedly owed to her by the partnership and the estate. In its written memorandum of judgment, the court initially found that Glenco was a mining partnership existing between the decedent and Frank Calcote. Observing that death does not terminate a mining partnership, the court nevertheless found that the estate's petition to wind up the affairs of Glenco as well as the decedent's petition to dissolve the partnership filed before his death was sufficient to bring the issue of winding up the partnership before the court. The court then ruled that the so-called "estate" claims of Frank and Bobbie Calcote should properly be directed against the partnership, not the estate, and found that "[t]he evidence [here shown] does not support the Calcote claims as being legitimate partnership debts." The court, finding no legitimacy in the Calcotes' claims and no value in assets allegedly arising since the decedent's death, determined the value of the partnership as of the date of the decedent's death and appointed a receiver to wind up the affairs of Glenco. In a subsequent post-trial order filed to clarify its judgment, the trial court affirmed its ruling denying the claims of Bobbie Calcote. Bobbie Calcote alone has filed this appeal from the judgment and post-trial order.

On appeal Bobbie Calcote contends that the trial court's judgment

was against the manifest weight of the evidence where the evidence was uncontradicted that she had both advanced money to the partnership and performed services for the partnership without payment. Bobbie Calcote asserts that since the trial court found that Glenco was a mining partnership that was not terminated by the death of a partner, the partnership was liable for amounts borrowed by the surviving partner, Frank Calcote, following the decedent's death. Bobbie Calcote additionally contends that regardless of whether the decedent or his estate consented to the receipt of loans or services rendered by her to the partnership, the partnership benefitted thereby and should not be unjustly enriched by the trial court's judgment denying her claims.

■ Neither the estate nor Bobbie Calcote has, on appeal, challenged the trial court's finding that Glenco was a mining partnership existing between the decedent and Frank Calcote. Since the record supports this finding by the trial court, the propriety of Bobbie Calcote's claims must be determined in light of the principles applicable to such partnerships.

As set forth in numerous Illinois cases, a mining partnership is a unique entity that arises

> "[w]here there is an association of individuals for producing oil or minerals from leasehold properties and the expenses of development and production and sale of the oil are divided or shared according to the holdings of the members of the association in the leasehold property, whether such division of expenses and profits is made with or without formal written or verbal agreement." (*Harris v. Young* (1921), 298 Ill. 319, 325-26, 131 N.E.2d 670, 673.)

(*Kinne v. Duncan* (1943), 383 Ill. 110, 48 N.E.2d 375; *Chapman v. Millemon* (1977), 47 Ill. App. 3d 392, 361 N.E.2d 1385.) In such a partnership, there is no *delectus personae*, the right to choose one's partner, as exists in ordinary commercial partnerships, and the partnership will not be dissolved by the sale of a partner's interest or the death of a partner. (See *Harris v. Young* (1921), 298 Ill. 319, 131 N.E.2d 670; *Kinne v. Duncan* (1943), 383 Ill. 110, 48 N.E.2d 375.) This distinction between an ordinary partnership and a mining partnership exists because of the need for continuous production inherent to mining and drilling operations. See Jones, *Mining Partnerships in Texas*, 12 Tex. L. Rev. 410, 413 (1934); 54 Am. Jur. 2d *Mines and Minerals* sec. 158, at 340 (1971).

■■ By reason of the absence of the *delectus personae* in a mining partnership, and the uncertain and changing membership that

results, a mining partner does not have the same general implied authority to bind his associates as exists in an ordinary partnership. (4 W. Summers, Oil and Gas sec. 726, at 299 (1962); 54 Am. Jur. 2d *Mines and Minerals* sec. 153 (1971).) Generally, the mining partner's authority to bind the partnership or to deal with partnership assets is limited to that expressly granted or necessarily implied from the relationship of the parties (2 H. Williams & C. Meyers, Oil and Gas Law sec. 435.1, at 507-08 (1985)), and the mining partner may bind the firm only "by such dealings, for the purpose of working the mine, as appear to be necessary or usual in the management and course of the business." (54 Am. Jur. 2d *Mines and Minerals* sec. 153, at 336 (1971); see 58 C.J.S. *Mines and Minerals* sec. 246 (1948).) As stated in *Wilkinson v. Bell* (1946), 118 Mont. 403, 407, 168 P.2d 601, 603:

> "The power and authority of a member of a mining partnership being limited, he may not, unless expressly authorized, borrow money for the firm, issue or negotiate commercial paper, or draw or accept bills of exchange on the credit of the firm. *** A managing partner has power to do what is reasonably necessary to the carrying on of the firm's mining business. *** But he has no authority to pledge the credit of the partnership for money borrowed for the purposes of the concern. [Citations.]"

This result obtains because "it would be unjust to subject each proprietor to personal liabilities which might sweep away all his property, created against his consent, by those who became members against his wishes. [Citations.]" (118 Mont. 403, 407, 168 P.2d 601, 603.) Thus, while a member of a mining partnership has implied authority to make such transactions as are necessary to carry on business in an ordinary way, he may not, unless expressly authorized, borrow money on the credit of the firm or execute promissory notes binding the partnership. 54 Am. Jur. 2d *Mines and Minerals* sec. 253, at 336, sec. 156, at 338 (1971); 58 C.J.S. *Mines and Minerals* sec. 246, at 693 (1948).

In the instant case it is uncontroverted that neither the decedent nor the estate after his death at any time authorized Frank Calcote, as a partner of Glenco, to borrow money from Bobbie Calcote for partnership purposes or to execute notes to Bobbie Calcote binding the partnership. Bobbie Calcote was aware at the time she began making the alleged advances to the partnership that the decedent was a partner of Glenco, yet she at no time sought authorization for the loans from the decedent or, following his death, from his estate. It is settled that one who knowingly contracts with a partner who is exceeding his authority cannot recover under the contract from the

partnership, but must look alone to the one with whom the contract was made. (58 C.J.S. *Mines and Minerals* sec. 246, at 694 (1948).) Since Frank Calcote had no authority to borrow money from Bobbie Calcote or to execute notes to her binding the partnership, Bobbie Calcote could not recover from the partnership for amounts allegedly loaned to the partnership by authority of Frank Calcote, and her claims against the partnership for these amounts must fail.

■ Even if, as was held in one case involving a mining partnership, a managing partner could be said to have implied authority to borrow money reasonably necessary to carry on partnership business instead of resorting to an assessment upon his partners (see *Rains v. Weiler* (1917), 101 Kan. 294, 166 P. 235; see also Annot., 24 A.L.R.2d 1359, 1366-67 (1952); 54 Am. Jur. 2d *Mines and Minerals* sec. 156, at 338 (1971)), the record here failed to show that Bobbie Calcote's alleged loans to Glenco were necessary to the transaction of partnership business so as to be a proper exercise of authority by Frank Calcote. Evidence presented by the Calcotes showed only that checks from Bobbie Calcote had been deposited into the Glenco account from time to time. While the Calcotes asserted that these amounts were used to pay partnership debts, the record on appeal contained no showing that the partnership was in need of funds at the time the deposits were made or that partnership debts were paid from these amounts rather than the amounts received from investors or from the sale of oil. The checkbooks and cancelled checks of Glenco, which were introduced at trial, were not included in the record on appeal and so provide no basis for finding that Bobbie Calcote's "loans" were required for the payment of partnership debts. The notations on the checks of Bobbie Calcote to the effect that they constituted personal loans to pay partnership debts lacked probative value due to the self-serving nature of the notations and Bobbie Calcote's admission that she "could have added" the notations later, after the checks were returned by the bank. Finally, the demand notes to Bobbie Calcote from Glenco and Frank Calcote, which were introduced at trial as evidence of the loans made to pay partnership debts, did not correspond either in date or amount with the checks written by Bobbie Calcote as "personal loans" and, in at least one instance, admittedly included an amount owed to Bobbie Calcote by Frank Calcote personally. The trial court thus properly disregarded such notes in finding that the claims of Bobbie Calcote for amounts allegedly loaned to Glenco did not constitute legitimate partnership debts. The record supports this determination by the trial court, and we accordingly affirm its decision in this regard.

■ From a review of the record, we likewise find that there was insufficient proof as to the extent and value of Bobbie Calcote's services to the partnership so that the trial court correctly denied her claim for payment for such services. While a managing partner of a mining partnership has authority to hire personnel necessary to the business of the firm, there was no showing here of any agreement or arrangement with the partnership by which Bobbie Calcote was to be paid for her services, which purportedly included typing, answering the telephone, and preparing mailings to investors. Bobbie Calcote made no claim for payment for these services during the decedent's lifetime, and it appears unlikely that she had contemplated such payment until after the decedent's death. The Calcotes' testimony, moreover, failed to show the reasonable value of such services in terms of the time expended by Bobbie Calcote or the cost of obtaining comparable services from another source. In the absence of such evidence there was no basis for Bobbie Calcote's claim for payment in the amount of $2,500 per well for the shallower wells and $3,500 per well for the deeper wells. Contrary to Bobbie Calcote's assertions on appeal, neither evidence of the bookkeeping and management fees currently charged by Dempsey Management for Glenco wells nor the estimated cost of "administrative and office supplies" on one of the 1980 wells was probative of the value of the services for which Bobbie Calcote sought compensation. Moreover, in view of Bobbie Calcote's testimony that only "light" typing was involved and the trial court's finding that the records of the partnership reflected a bookkeeping system that was both "inadequate" and "inaccurate," it appears that Bobbie Calcote's services to the partnership were of questionable value and that the amount claimed by her for such services was grossly inflated. The record, therefore, supports the trial court's denial of Bobbie Calcote's claims for compensation, and we find no basis for overturning the trial court's ruling to this effect.

■ While Bobbie Calcote contends finally that the partnership was unjustly enriched by the loans and services rendered by her to the partnership without payment, the record fails to show that the partnership benefitted from Bobbie Calcote's dealings with the partnership so as to render the trial court's denial of her claims inequitable. As discussed above, there was no showing that the amounts deposited into Glenco's account by Bobbie Calcote were required for the payment of partnership debts or, indeed, what purpose was served by Bobbie Calcote's unauthorized deposits into the partnership account. In any event, Bobbie Calcote knowingly dealt with Frank Calcote alone without seeking approval or authorization from either the dece-

dent or his estate, and she cannot now be heard to complain that she has been injured by such dealings. As for the services allegedly rendered to the partnership by Bobbie Calcote, the record fails to reflect that her services were either requested or needed or that she acted other than as a mere volunteer in her husband's partnership business. Because of the lack of proof of the extent or value of Bobbie Calcote's alleged services, moreover, it cannot be said that the partnership was unjustly enriched so as to require reversal of the trial court's ruling denying her claim for payment.

For the reasons stated in this opinion, we find that the trial court's ruling was correct and, accordingly, affirm the judgment of the circuit court of Jasper County.

Affirmed.

KARNS, P.J., and WELCH, J., concur.